Andrea Weiss Jeffries
(*pro hac vice* application pending)
WILMER CUTLER PICKERING
HALE AND DORR LLP
350 South Grand Avenue, Suite 2100
Los Angeles, CA 90071
Tel: (213) 443-5397
Fax: (213) 443-5400
andrea.jeffries@wilmerhale.com

Robert C. Lukes
Alan F. McCormick
GARLINGTON, LOHN & ROBINSON, PLLP
350 Ryman Street • P. O. Box 7909
Missoula, MT  59807-7909
Telephone (406) 523-2500
Telefax (406) 523-2595
rclukes@garlington.com
afmccormick@garlington.com

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| GTAT CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>CHAD FERO,<br><br>Defendant. | Case No.<br><br>COMPLAINT FOR VIOLATION OF DEFEND TRADE SECRETS ACT, OTHER CLAIMS, DAMAGES, TEMPORARY RESTRAINING ORDER AND JURY DEMAND |

Plaintiff GTAT Corporation ("GTAT"), by and through its counsel, for its

Complaint against Defendant Chad Fero ("Fero"), hereby alleges as follows:

## THE PARTIES

1.      Plaintiff GTAT is a corporation, organized and existing under the laws of the State of Delaware, with its principal place of business in Merrimack, New Hampshire.  GTAT is a diversified technology company that offers innovative crystal growth equipment, technical processes, and equipment solutions for the global solar, LED, and electronics industries.  The GTAT technology line at issue in this matter—its polysilicon line—operates out of Missoula, Montana.

2.      On information and belief, Defendant Chad Fero is an individual residing and domiciled in Missoula, Montana.  Fero was employed by GTAT from April 2006 to September 2016.  According to online records, Fero created a website called "www.ferosilicon.com" in May 2011.  In June 2015, Fero began operating a company called "Ferosilicon LLC," also in Missoula.  Through Ferosilicon, Fero has been using and disclosing GTAT's proprietary trade secrets in his attempts to sell a comprehensive polysilicon production solution, including sophisticated polysilicon technology and equipment designs, to current and prospective GTAT customers.

## JURISDICTION AND VENUE

3.      This Court has original federal question jurisdiction of this action pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836(c), under 28 U.S.C. § 1331.  Additionally, this Court has supplemental jurisdiction over the other claims

asserted herein pursuant to 28 U.S.C. § 1367. Further, the parties to this action

maintain completely diverse citizenships, and the amount in controversy exceeds

the jurisdictional amount. Thus, this Court also has subject matter jurisdiction

pursuant to 28 U.S.C. §1332.

4.     Venue is proper in this Court because the transactions giving rise to

this action occurred in the District of Montana and Defendant resides in Montana.

Pursuant to L.R. 3.2, the Missoula Division is proper because transactions giving

rise to this action occurred in Missoula County and the Defendant resides in

Missoula County.

## FACTUAL ALLEGATIONS

5.     GTAT is a diversified technology company that offers innovative

crystal growth equipment, technical processes, and equipment solutions for the

global solar, LED, and electronics industries. GTAT's market leadership is based

on a history of delivering innovative products that provide sustained value to its

customers by lowering the cost of manufacturing and improving operational

efficiency. GTAT's solutions involve years of research and development into

chemical processes, materials, and equipment to optimize manufacturing and

production of intermediate and final products used in the above-mentioned

industries. The technology line at issue in this matter – GTAT's polysilicon line –

involves technology and equipment for the production of polysilicon and specialty

gasses for the solar and semiconductor industries, and operates out of Missoula, Montana.

6.     In March 2016, GTAT completed a financial restructuring and emerged from Chapter 11 bankruptcy.  Since that time, GTAT has been rebuilding its business by focusing on its industry leading capabilities in key markets, including the solar market, where GTAT has highly advanced polysilicon offerings which incorporate numerous technical innovations that have been developed by GTAT over the past decade.

7.     Chad Fero began working for GTAT in April 2006, as an employee of GT Solar, the former name of GTAT.  Fero began working for GT Solar as an engineering manager, and moved up to the role of Director of Polysilicon Technology and Business Development at GTAT.  During his 10-plus years at GTAT, Fero was involved in all aspects of the research and development of GTAT's polysilicon processes, materials, and equipment.  Fero was also involved on the transactional side of GTAT's polysilicon business, including sales and marketing.

8.     Fero was a full-time employee of GTAT until September 2016. After attempting to renegotiate his compensation package in 2016, Fero left GTAT's employment in September of that year, and entered into a consulting

arrangement with the Company that ran from early October 2016 to early January 2017.

## Fero's April 2006 Confidentiality Agreement

9.     While working for GTAT, Fero was exposed to and helped to develop GTAT's proprietary information relating to its polysilicon technology and equipment, as well as GTAT's proprietary information relating to the polysilicon business more broadly.  As is the case with all new GTAT employees, when Fero joined the Company, he signed an employment agreement that required him to keep confidential technical and business information acquired at GTAT even after his employment ended.  Attached as Exhibit 1 is a copy of Fero's employment agreement (redacted to withhold salary information) with his confidentiality agreement (hereinafter, "Confidentiality Agreement").

10.     Fero entered into his Confidentiality Agreement with GTAT on April 12, 2006.  Pursuant to the agreement, Fero acknowledged that his employment created:

> [A] relationship of confidence and trust between [Fero]
> and the Company with respect to certain information
> applicable to the business of the Company or applicable
> to the business of any client or customer of the Company,
> which may be made known to [Fero] by the Company or
> by any clients or customer of the Company, or learned by
> [Fero] during the period of [his] employment.

Ex. 1 at 3, § 1.B.

11.     In addition, Fero agreed that "[a]ll Proprietary Information shall be

the sole property of the Company and its assigns," and "acknowledge[d] that

all Proprietary Information is and must continue to be confidential and that the

same is not readily accessible to competitors of the Company." *Id.*, § 2. As

defined in the Agreement, "Proprietary Information" includes (but is not

limited to) "information that has been created, discovered or developed by, or

otherwise become known to, the Company (including, without limitation,

information created, discovered, developed or made known by [Fero] during

the period of or arising out of [his] employment by the Company . . . . " *Id.*, §

1.C.

12.     Fero further agreed that:

> At all times, both during [his] employment by the
> Company and after its termination, [he] will keep in
> strictest confidence and trust all Proprietary Information
> and [he] will not use or disclose any Proprietary
> Information without the written consent of the Company,
> except as may be necessary in the ordinary course of
> performing [his] duties as an employee of the Company.

*Id.*, § 2.

13.     Fero additionally agreed that, upon termination, he was to:

> deliver to the Company all documents, notes, drawings,
> blueprints, formulae, specifications, computer programs, data
> and other materials of any nature pertaining to any Proprietary
> Information or to [his] work with the Company, and [avoid

taking] any of the foregoing or any reproduction of any of the foregoing . . . embodied in a tangible medium of expression.

*Id.*, § 4.

### GTAT's Proprietary Trade Secret Polysilicon Technologies and Equipment

14.    Polycrystalline silicon, or polysilicon, is a very high purity, polycrystalline form of silicon, used as a raw material by the solar photovoltaic and electronics industries.  Polysilicon is produced from metallurgical grade silicon through a complex process.  Traditionally, the production of polysilicon was done through a chemical purification process called the Siemens process, which involves distillation of volatile silicon compounds and their decomposition into silicon at high temperatures.

15.    More recently, an alternative process of refinement has evolved, which uses a fluidized bed reactor ("FBR") for part or all of the process.  Over the last 10-plus years, GTAT has done a vast amount of research and development to create its own, proprietary polysilicon process, using the FBR approach on the front end of its process, and an improved Siemens process on the back end of the process.

16.    GTAT's proprietary approach to creating polysilicon includes innovative chemical processes and equipment in two main stages of polysilicon production: (i) the production and purification of trichlorosilane (TCS) gas through hydrochlorination; and (ii) the deposition of highly purified

2224502

polysilicon onto filaments through a chemical vapor deposition (CVD) process. The first stage (TCS) also involves GTAT's proprietary industrial effluent treatment to detoxify the by-products of the hydrochlorination process.

17.     While general processes for producing polysilicon are known, GTAT engineers have been working for more than a decade on both of these main stages to develop highly optimized, economical systems.  For example, GTAT's proprietary hydrochlorination process involves the mixing of critical gases under certain highly specific conditions, and the subsequent introduction of the gaseous mixture in a particular manner to a floating bed of silicon contained in a highly specialized reactor, known as a "fluidized bed reactor" or FBR.  Development of the type, composition, and mixing conditions of gases, as well as the specific materials, geometry, and internals (e.g., spray nozzles) of GTAT's FBR, took several years of research and development by a team of several engineers as well as additional consultants.

18.     Similarly, GTAT's CVD process involves materials, equipment, and process conditions that were developed by GTAT engineers over a number of years of conducting numerous experiments and trial runs.

19.     As Director of Polysilicon Technology, Fero was involved in and intimately familiar with the research and development of all of GTAT's polysilicon technology, including the TCS and CVD stages referenced above.  GTAT's R&D

efforts led to significant learning about the relative merits and demerits of the numerous materials, equipment, and process conditions that GTAT tested, as well as how polysilicon systems and equipment could be optimized.

20.     GTAT treats all of this information—all of its experimental results, including the relative advantages and disadvantages of various process parameters, equipment materials and geometries, and equipment internals—as highly confidential and proprietary to GTAT.  How a process or equipment parameter contributes to or detracts from the overall polysilicon production process, in terms of efficiency, purity, and/or cost, is competitively sensitive information that is essential to GTAT's ability to differentiate itself in the market and to compete effectively.  GTAT uses the information it has gained from its internal, proprietary experimentation to inform its business model, sales presentations, and overall market positioning.

21.     Like all GTAT employees, Fero was well aware of the confidential, proprietary nature of GTAT's R&D efforts and GTAT's technology and equipment solutions.  All of the company's technology descriptions and experimentation documentation are labeled "GTAT Confidential," or "GT Confidential or Proprietary."  GTAT's sales materials are also labeled in this way.  In fact, on several occasions while Fero was working for GTAT, he had technical information

removed from sales materials because it was too sensitive to provide to a potential customer.

## GTAT's Protection of its Proprietary Technology

22.    GTAT takes significant steps to protect its confidential, proprietary and trade secret documents and information.  For example, upon employment, all employees must sign a non-disclosure agreement with very clear confidentiality provisions.  As discussed above, Fero entered into such an agreement.  In addition, employees must read and sign a form confirming compliance with a Code of Conduct Policy that explains the importance of protecting confidential and proprietary information.  GTAT also holds meetings on maintaining the confidentiality of GTAT's intellectual property and proprietary information.

23.    Furthermore, GTAT limits access to sensitive confidential information and trade secrets.  GTAT's computer systems are password protected, and its server and network equipment is protected by various security measures, such as highly restricted key access and badge access restricted to a very small number of employees who need access.  GTAT's R&D sites are also protected by physical security measures, such as restricted badge and/or key entry.

24.    GTAT keeps its supply and distribution channels limited to a very small number of trusted entities, and requires each of its consultants, suppliers, customers, and visitors, and other contracting partners to enter into confidentiality

agreements in connection with their work for GTAT.  This includes all consultants,

suppliers, customers, and other contracting partners involved in GTAT's

polysilicon product line.

### Fero's Actions Immediately Prior to Leaving GTAT

25.    As discussed above, Fero was a GTAT employee until September 16,

2016.  On September 16, 2016, as part of his departure process, Fero turned in his

work laptop to GTAT.

26.    GTAT recently discovered that Fero installed two of his own,

personal USB drives (also known as a thumb or flash or jump drive) into his

GTAT laptop within days of returning the laptop to GTAT.  USB drives are used

to copy documents from a laptop or desktop computer into a small, transportable

memory.  USB drives come in different sizes, but even the smallest modern USB

drives hold about 2GB of data.  A 2GB USB drive will allow for storage of over

50,000 documents.  USB drives are also available in 8GB, 16GB, 32GB, 64GB,

128GB, 512GB, and even 2TB storage sizes.  These larger sizes hold larger and

larger amounts of data – a 512GB USB drive, for example, can store many

millions of documents.

27.    Typical users do not store anywhere near 50,000 documents of

personal data on their work laptops; that Fero used two USB drives suggests that

he may have copied very large files such as GTAT's BEP and highly technical

drawings and files.  GTAT has a policy requiring users to obtain an encrypted USB

drive from the Company before using one.  Fero did not ask for a GTAT-issued

USB drive, nor did he ask for permission to use his USB drives.

28.    The majority of Fero's files, including GTAT's proprietary and trade

secret information, were contained in two folders on his desktop.  It would have

been very simple for him to drag and drop these materials onto the USB drives he

installed just days before departing GTAT.  In fact, there does not seem to be any

legitimate reason Fero would have installed two USB drives days before his

departure.

### Ferosilicon LLC

29.    While he was still employed by GTAT, Fero formed a limited

liability company ("LLC") called "Ferosilicon LLC," which was established in

June 2015.  Moreover, Fero registered a website, "ferosilicon.com," in 2011,

also while he was working for GTAT.

30.    At least since mid-April of this year, and likely earlier, Fero has

been operating a business under the name "Ferosilicon LLC."  As detailed

further below, through Ferosilicon, Fero has been attempting to sell a

comprehensive polysilicon production solution, including complex,

sophisticated polysilicon technology and equipment designs, to current and

prospective GTAT customers.  Given that Fero only departed from GTAT's

employ seven months ago, and was working as a consultant for GTAT until just three months ago, it is unfathomable that he independently developed the chemical processes, equipment designs, and engineering specifications he is now offering without using any of GTAT's trade secret information. It took teams of GTAT engineers working full time for more than a decade to develop, design, and refine GTAT's polysilicon technology solutions. Fero could not have legitimately developed a full suite of polysilicon technology solutions on his own in just a few months.

### Injury to GTAT and GTAT's Need for Immediate Relief

31.     GTAT has invested significant money, time, and effort, in the research and development that has led to its proprietary processes, equipment materials, and designs. All told, over 20 engineers have worked full time in GTAT's Polysilicon Division over the past 10-plus years. These engineers have been supported by additional staff members, as well as by a number of consultants who have worked for GTAT over the years. GTAT has invested millions of dollars in this effort, accounting for salaries as well as equipment and engineering costs.

32.     Since at least mid-April, and perhaps earlier, Fero has been communicating with GTAT's customers and prospects in an attempt to sell them polysilicon technology and equipment designs that, on information and belief,

incorporate GTAT's proprietary trade secret information. Fero has been offering polysilicon technology and equipment designs in the form of Basic Engineering Packages or "BEPs" at rock-bottom prices that have already cost GTAT significant sales opportunities and that threaten to fundamentally and irreparably harm GTAT's ability to compete in the polysilicon market.

33.    For example, in late April 2017, a GTAT sales team traveled to China to close a $10 million technology and equipment deal with a Chinese company, only to be told when it arrived that the terms previously negotiated were no longer acceptable, because Chad Fero had offered a BEP and equipment guarantee at a very aggressive price point. Fero's offer had caused the company to believe that it no longer needed GTAT's equipment and technology, because it could get what it needed from Fero's BEP and equipment guarantee. Although GTAT does not typically sell its BEPs separately, it was forced to do so in this case for less than $1 million in order to maintain good relations with this company in light of Fero's conduct.

34.    Fero's use of GTAT's trade secret information in his BEP and interference in GTAT's equipment sale to the Chinese company referenced above caused GTAT significant harm beyond the loss of the $10 million deal. GTAT had entered into negotiations with equipment fabricators for exclusive supplier agreements. These agreements would have enabled consistency of design quality

and lower cost for GTAT's customers, as well as increased profitability and longevity of GTAT's equipment sales in China.  However, these negotiations fell apart once GTAT was prevented from securing the equipment sales with this customer in China due to Fero's BEP offer and guarantee that improperly incorporated GTAT's trade secrets.

35.    Thus, GTAT has already suffered significant harm due to Fero's use of its trade secrets.  GTAT will suffer additional harm in the form of lost sales, lost customers, and substantial price erosion, if Fero is not prevented from using GTAT's trade secrets to compete against GTAT.

## FIRST CAUSE OF ACTION

### Misappropriation of Trade Secrets Under the Defend Trade Secrets Act (U.S.C. § 1836, *et seq.*)

36.    Plaintiff repeats, realleges, and incorporates by reference the prior allegations of this Complaint as if fully set forth herein.

37.    Plaintiff owns and possesses certain confidential, proprietary and trade secret information, as alleged above.

38.    This confidential, proprietary, and trade secret information relates to products and services used, sold, shipped, and ordered in, or intended to be used, sold, shipped, and/or ordered in, interstate or foreign commerce.

39.    Plaintiff has taken reasonable measures to keep such information secret and confidential.

40.     This confidential, proprietary, and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information.

41.     In violation of Plaintiff's rights, Defendant misappropriated the confidential, proprietary and trade secret information in the improper and unlawful manner as alleged herein.

42.     On information and belief, Defendant's misappropriation of the confidential, proprietary, and trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive.

43.     On information and belief, if Defendant's conduct is not remedied, and if Defendant is not enjoined, Defendant will continue to misappropriate, disclose, and use for his own pecuniary and personal benefit and to Plaintiff's detriment, Plaintiff's trade secret information.

44.     As the direct and proximate result of Defendant's conduct, Plaintiff has suffered and, if Plaintiff's conduct is not stopped, will continue to suffer, irreparable injury and significant damages, in an amount to be proven at trial but in any event more than $75,000.

45.     Because Plaintiff's remedy at law is inadequate, Plaintiff seeks, in addition to damages, injunctive relief to protect its confidential, proprietary, and

trade secret information. Plaintiff's business relies on its confidential and trade secret information to maintain and grow its client base in a competitive market and will continue suffering irreparable harm without injunctive relief.

46.     Plaintiff has been damaged by all of the foregoing, and is entitled to its damages, in an amount to be determined at trial, as well as an award of exemplary damages and attorney's fees.

## SECOND CAUSE OF ACTION

### Misappropriation of Trade Secrets Under the
### Montana Uniform Trade Secrets Act
### (Mont. Code Ann. § 30-14-401, et seq.)

47.     Plaintiff repeats, realleges, and incorporates by reference the prior allegations of this Complaint as if fully set forth herein.

48.     GTAT took reasonable steps to maintain the secrecy of its confidential information and trade secrets.

49.     GTAT's confidential information and trade secrets have economic value derived from their secrecy.

50.     Defendant has misappropriated GTAT's confidential information and trade secrets, including but not limited to trade secrets as defined in the Uniform Trade Secrets Act, Montana Code Annotated § 30-14-402(4)(a)-(b), namely:

[I]nformation or computer software, including a formula, pattern, compilation, program, device, method, technique or process that:

(a) derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and

(b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

51.    As a result of such misappropriation, GTAT is entitled to damages.

52.    Pursuant to the Uniform Trade Secrets Act, Montana Code Annotated § 30-14-403, GTAT is entitled to injunctive relief prohibiting Defendant from continuing to use or disclose GTAT's confidential and trade secret information.

53.    Pursuant to the Uniform Trade Secrets Act, Montana Code Annotated § 30-14-404, GTAT is entitled to exemplary damages.

54.    Pursuant to the Uniform Trade Secrets Act, Montana Code Annotated § 30-14-405, GTAT is entitled to recover its reasonable attorney's fees.

## THIRD CAUSE OF ACTION

### Breach of Written Contract

55.    Plaintiff repeats, realleges, and incorporates by reference the prior allegations of this Complaint as if fully set forth herein.

56.    The Confidentiality Agreement is a valid and enforceable contract between GTAT and Fero.

57.    Pursuant to his Confidentiality Agreement with GTAT, Fero was obligated during his employment and after its termination to "keep in strictest confidence and trust all Proprietary Information and . . . not use or disclose any Proprietary Information without the written consent of the Company, except as may be necessary in the ordinary course of performing [his] duties as an employee of the Company."  Ex. 1, § 2.  Put simply, Defendant was obligated to keep confidential, during and after his employment with GTAT, all GTAT confidential, proprietary and trade secret information.

58.    Pursuant to his Confidentiality Agreement, Fero was also prohibited from taking any of GTAT's proprietary information with him in the event of the termination of his employment.

59.    Fero materially breached these contractual obligations by transferring, without authorization, GTAT's proprietary information to his USB drives.  He similarly materially breached these contractual obligations when he failed to keep in strict confidence and trust GTAT's proprietary information and by using and disclosing GTAT's proprietary information after leaving the company without its written consent.  Defendant did so by offering to sell GTAT's confidential,

proprietary and trade secret information to firms in the polysilicon industry for his own benefit.

60.   As a direct and proximate cause of Defendant's breach, Plaintiff has suffered extensive monetary damages, the exact amount to be determined at trial.

61.   Plaintiff will continue to be directly and proximately damaged, and its stature in the market reduced, if Defendant is not enjoined from further violation of his Confidentiality Agreement and is not directed to comply. Plaintiff has no adequate remedy at law because monetary damages alone will not fully compensate Plaintiff. Injunctive relief is warranted to prevent further irreparable harm to Plaintiff.

62.   Accordingly, Plaintiff seeks damages and injunctive relief.

## FOURTH CAUSE OF ACTION

### Breach of Implied Covenant of Good Faith and Fair Dealing

63.   Plaintiff repeats, realleges, and incorporates by reference the prior allegations of this Complaint as if fully set forth herein.

64.   The Confidentiality Agreement between Plaintiff and Defendant contained an implied covenant of good faith and fair dealing.  This implied covenant obligated Defendant to refrain from any act that would deprive Plaintiff of the benefits of the agreement or that would impede Plaintiff from performing any or all of the conditions of the agreement that it agreed to perform.

2224502

20

65.    Defendant's misconduct as described in this Complaint breached the implied covenant of good faith and fair dealing.  Specifically, Defendant breached the implied covenant when Defendant transferred, without authorization, GTAT's proprietary information to his USB drives and further misappropriated GTAT's confidential and proprietary trade secret information relating to its polysilicon technology.

66.    Defendant further breached the implied covenant when he disclosed GTAT's proprietary and trade secret information to customers and used the same trade secrets in his own business endeavors.

67.    As a proximate result of these breaches and the other improper conduct alleged in this Complaint, Plaintiff has been irreparably harmed and has suffered damages in an amount to be determined at trial.  Because Plaintiff's remedy at law is lacking, Plaintiff also seeks, in addition to damages, injunctive relief.

## FIFTH CAUSE OF ACTION

### Intentional Interference with Business Relations

68.    Plaintiff repeats, realleges, and incorporates by reference the prior allegations of this Complaint as if fully set forth herein.

69.    Defendant intentionally and willfully interfered with Plaintiff's business relationship with at least one customer.  Defendant had knowledge that

2224502

21

Plaintiff was in negotiations with the potential customer, and Defendant subsequently used Plaintiff's proprietary and trade secret information to lure the potential customer away from Plaintiff. Upon information and belief, Defendant has likely committed, and is continuing to commit, similar acts with Plaintiff's other customers and potential customers.

70.   Defendant's interference was calculated to cause damage to Plaintiff's business.

71.   Defendant's interference was also done with the unlawful purpose of causing damage or loss, without right or justifiable cause on the part of Defendant.

72.   As a result of Defendant's intentional interference with Plaintiff's business relations, Plaintiff has suffered actual damages and other losses.

73.   Accordingly, Plaintiff seeks damages and injunctive relief.

## SIXTH CAUSE OF ACTION

### Punitive Damages

74.   Plaintiff repeats, realleges, and incorporates by reference the prior allegations of this Complaint as if fully set forth herein.

75.   As described above, Defendant deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to Plaintiff.

76.   Defendant deliberately proceeded to act with indifference to the high probability of injury to Plaintiff.

77.     Defendant's actions were undertaken with actual malice, as described under Montana Code Annotated § 27-1-221, entitling Plaintiff to an award of punitive damages.

**WHEREFORE,** GTAT respectfully requests judgment in its favor and against Defendant as follows:

A.     For a judgment against Defendant in an amount to be determined at trial for misappropriation of trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836(c) and the Montana Uniform Trade Secrets Act, Montana Code Annotated § 30-14-401, *et seq.*, and exemplary damages;

B.     For a judgment against Defendant in an amount to be determined at trial for breach of written contract;

C.     For a judgment against Defendant in an amount to be determined at trial for breach of implied covenant of good faith and fair dealing;

D.     For a judgment against Defendant in an amount to be determined at trial for intentional interference with business relations, and for exemplary and/or punitive damages, as warranted, in an amount to be determined at trial;

E.     For injunctive relief, preliminarily and permanently enjoining and restraining Defendant from using or disclosing Plaintiff's proprietary and trade secret information and from violating his legal and contractual duties to Plaintiff;

F.      For an award of Plaintiff's pre-judgment and post-judgment interest and its attorney's fees, costs, and other expenses incurred in this action; and

G.      For such other and further relief as this Court deems just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury for all issues so triable.

DATED this 1st day of May, 2017.


        /s/  Robert C. Lukes
        Attorneys for Plaintiff

# Exhibit 1

April 12, 2006

Chad Fero
P.O. Box 4323
Butte, MT 59702

Dear Chad:

We are pleased to offer you a staff position at GT Equipment Technologies, Inc. (GT) as a Senior Engineering Manager reporting to David Keck starting April 12, 2006. Your job responsibilities for this position will include, but not be limited to, providing engineering services to assist in the planning and development of GT's polysilicon production equipment and engineering services business.

We hereby extend an offer to you at a base salary of ███████████████████████ per two-week pay period, paid on a bi-weekly basis ("Base Salary"). In addition to your Base Salary, you will be eligible during each twelve (12) months of your employment to receive ████████████████████████████



The Company shall pay to you a one time payment of █████████████████████████ in full consideration of all costs to be incurred by you in relocating to offices in Missoula, Montana ("Relocation Benefit"). █████████████████ shall be due and payable within thirty (30) days of the execution of this Agreement and the remainder upon completion of your relocation. In the event that during the first three (3) years this Agreement is in effect you voluntarily terminate your employment with the Company, other than for Good Reason, you agree to reimburse the Company for all Relocation Benefits paid by the Company, pro rata based on the period of your employment during such three year period.

We offer a comprehensive group of benefits, which currently include medical/dental insurance offered as a pre-tax benefit for which we pay a portion and long term and short term disability and life insurance (paid by GT). With the exception of medical insurance, which is available beginning the first of the month following your date of hire, you are not eligible for these benefits until after your first ninety days with the Company. We also have a 401K retirement savings plan to which GT contributes by matching 50% of your contributions, to a maximum GT contribution of 3% of your Base Salary. Other benefits include eleven paid holidays and three (3) weeks of paid vacation per year. Upon joining GT, you will be provided with a copy of the Employee Manual and insurance booklets, which outline our personnel policies and benefits programs. If you choose to accept this offer, please understand your employment is "at-will", voluntarily entered into, and is for no specific period. This offer letter and you employment by GT creates no contract of employment, express or implied.

The foregoing notwithstanding, during the first three (3) years following your employment, in the event your employment is terminated other than for cause, death or disability or your Base Salary or position of responsibility are reduced, or you are required by GT to move more than 75 miles from Missoula Montana, you will receive a severance benefit consisting of the continuation of Base Salary and medical benefits for twelve (12) months following termination. In the event that after the first three (3) years following your employment your employment is terminated by GT other than for cause, death or disability or your Base Salary or position of responsibility are reduced, or you are required by GT to move more than 75 miles from Missoula Montana, you will receive a severance benefit consisting of the continuation of Base Salary and medical benefits for six (6) months following termination. Payment of the severance benefits described above is conditioned upon your entering into a release of claims in favor of GT in form and substance acceptable to GT.

As a condition of employment, you are required to sign an invention and non-disclosure/non-compete agreement. You are also required, within three business days of your date of hire, to show proof of citizenship, permanent residency in the U.S., or authorization to work in the U.S. To indicate your acceptance of this offer, please sign below. This letter, along with the GT Employee Manual that you will receive at the start of employment, sets forth

Exhibit 1 - 1

the terms of your employment with GT and supersedes all prior representations or agreements, whether written or oral. This letter may only be modified by a written agreement signed by you and the President of GT Equipment Technologies, Inc.

We believe that GT can provide you with challenges and rewards that are unequaled elsewhere. We are truly excited about the prospect of you joining us, and look forward to receiving the signed original of this letter as acceptance of this offer. We are confident that our affiliation will be of mutual benefit and great satisfaction to both parties.

Sincerely,

I accept this offer of employment as stated herein:

_(signature)_          12 APRIL 2006
_(date)_

Susan Sulesky
Human Resources

_(signature)_          12 April 2006
_(date)_

_Attachment_

Exhibit 1 - 2

EXHIBIT A

## GT EQUIPMENT TECHNOLOGIES, INC. EMPLOYEE, NON-COMPETITION, NON-DISCLOSURE, PROPRIETARY INFORMATION AND PATENT AND INVENTION ASSIGNMENT AGREEMENT

In consideration of my employment or continued employment, as the case may be, with GT Equipment Technologies, Inc. (the "Company"), and the compensation received by me from the Company, from time to time, I hereby agree with the Company as follows:

1.   **Proprietary Information and Inventions** - I understand and acknowledge that:

   A.   The Company is engaged in a continuous program of research, design, development, production, marketing and servicing with respect to its business and that as part of my employment by the Company, I am (or may be), expected to make new contributions and inventions of value to the Company.

   B.   My employment creates a relationship of confidence and trust between me and the Company with respect to certain information applicable to the business of the Company or applicable to the business of any client or customer of the Company, which may be made known to me by the Company or by any client or customer of the Company, or learned by me during the period of my employment.

   C.   The Company possesses, and will continue to possess, information that has been created, discovered or developed by, or otherwise become known to, the Company (including, without limitation, information created, discovered, developed or made known by me during the period of or arising out of my employment by the Company, whether before or after the date hereof) or in which property rights have been or may be assigned or otherwise conveyed to the Company, which information has commercial value in the business in which the Company is engaged and is treated by the Company as confidential. All such information is hereinafter called "Proprietary Information", which term, as used herein, shall also include, but shall not be limited to, systems, processes, formulae, data, functional specifications, computer programs, blueprints, know-how, improvements, discoveries, developments, designs, inventions, techniques, marketing plans, strategies, forecasts, new products, unpublished financial statements, budgets, projections, licenses, prices, costs and customer and supplier lists; provided, however, that the term "Proprietary Information" shall not include any of the foregoing which is in the public domain.

   D.   All existing lists of customers of the Company, and all lists of customers of the Company developed during the course of my employment by the Company, are and shall be the sole and exclusive property of the Company, and that I neither have nor shall have any right, title or interest therein; such lists of customers are and must continue to be confidential; such lists of customers are not readily

Exhibit 1 - 3

accessible to competitors of the Company; and the Company's present and future business relationship with its customers is and will continue to be of a type which normally continues unless interfered with by others.

E.   As used herein, the period of my employment includes any time during which I may be
retained by the Company as an Independent Contractor.

2. <u>Ownership of Proprietary Information</u> - All Proprietary Information shall be the sole property of the Company and its assigns, and the Company and its assigns shall be the sole owner of all patents, copyrights, trademarks and other rights in connection therewith. I hereby assign to the Company any rights I may have or acquire in such Proprietary Information. I hereby acknowledge that all Proprietary Information is and must continue to be confidential and that the same is not readily accessible to competitors of the Company. At all times, both during my employment by the Company and after its termination, I will keep in strictest confidence and trust all Proprietary Information and I will not use or disclose any Proprietary Information without the written consent of the Company, except as may be necessary in the ordinary course of performing my duties as an employee of the Company.

3. <u>Commitment to Company; Other Employment</u> - During the period of my employment by the Company, I will devote substantially all of my time for the Company and I will not, without the Company's prior written consent, engage in any employment or business other than for the Company.

4.   <u>Documentation</u> - In the event of the termination of my employment for any reason, I will deliver to the Company all documents, notes, drawings, blueprints, formulae, specifications, computer programs, data and other materials of any nature pertaining to any Proprietary Information or to my work with the Company, and will not take any of the foregoing or any reproduction of any of the foregoing that is embodied in a tangible medium of expression.

5. <u>Disclosure of Inventions</u> - I will promptly disclose to the Company (or any persons designated by it) all discoveries, developments, designs, improvements, inventions, blueprints, formulae, processes, techniques, computer programs, strategies, know-how and data, whether or not patentable or registerable under copyright or similar statutes, made or conceived or reduced to practice or learned by me, either alone or jointly with others, during the period of my employment that are related to the business of the Company or that result from tasks assigned to me by the Company or that result from the use of premises or property (including computer systems and engineering facilities) owned, leased or contracted for by the Company (all such discoveries, developments, designs, improvements, inventions,      formulae, processes, techniques, computer programs, strategies, blueprints, know-how and data are hereinafter referred to as "Inventions"). I will also promptly disclose to the Company, and the Company hereby agrees to receive all such disclosures in confidence, all other discoveries, developments, designs,

Exhibit 1 - 4

improvements, inventions, formulae, processes, techniques, computer programs, strategies, blueprints, know-how and data, whether or not patentable or registerable under copyright or similar statutes, made or conceived or reduced to practice or learned by me, either alone or jointly with others, during the period of my employment for the purpose of determining whether they constitute "Inventions", as defined above.

6.   **Ownership of Inventions** - All Inventions shall be the sole property of the Company and its assigns, and the Company and its assigns shall be the sole owner of all patents, copyrights, trademarks and other rights in connection therewith. I hereby assign to the Company any rights I may have or acquire in such Inventions. I shall assist the Company in every proper way as to all such Inventions (but at the Company's expense) to obtain and, from time to time, enforce patents, copyrights, trademarks and other rights and protections relating to said Inventions in any and all countries, and to that end, I will execute all documents for use in applying for and obtaining such patents, copyrights, trademarks and other rights and protections on and enforcing such Inventions, as the Company may desire, together with any assignments thereof to the Company or persons designated by it. My obligation to assist the Company in obtaining and enforcing patents, copyrights, trademarks and other rights and protections relating to such Inventions in any and all countries shall continue beyond the termination of my employment, but the Company shall compensate me at a reasonable rate after my termination for time actually spent by me at the Company's request on such assistance. In the event the Company is unable, after reasonable effort, to secure my signature on any document or documents needed to apply for or prosecute any patent, copyright or other right or protection relating to an Invention, for any reason whatsoever, I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney-in-fact, to act for and on my behalf to execute and file any such application or applications and to do all other lawfully permitted acts to further the prosecution and issuance of patents, copyrights or similar protections thereon with the same legal force and effect as if executed by me and I hereby ratify, affirm and approve all such lawfully permitted acts accordingly.

7.   **Other Agreements** - I represent and warrant that my execution and delivery of this Agreement and the performance of all the terms of this Agreement does not and will not breach any agreement to keep in confidence proprietary information acquired by me in confidence or trust. I have not entered into and shall not enter into any agreement, either written or oral, in conflict herewith.

8.   **Use of Confidential Information of Other Persons** - I represent that I have not brought and will not bring with me to the Company or use at the Company any materials or documents of an employer or a former employer that are not generally available to the public, unless express written authorization from such employer for their possession and use has been obtained. I also understand that I am not to breach any obligation of confidentiality that I have to any employer or former employer and agree to fulfill all such obligations during the period of my affiliation with the Company.

Exhibit 1 - 5

9.  **Restrictive Covenant** - I hereby acknowledge and recognize my possession of Proprietary Information and the highly competitive nature of the business of the Company and accordingly agree that, in consideration of the premises contained herein, I will not, during the period of my employment by the Company and in the event that my employment with the Company is terminated for any reason whatsoever and whether such termination be voluntary or involuntary, for a period of three (3) years  years following such termination, (i)  directly or indirectly engage in any competitive business (defined as a business that designs, develops, manufactures, markets or sells a product, product line or service that competes with any product, product line or service of the Company as they presently exist or as may be in existence or development on the date of termination of my employment with the Company; whether such engagement shall be as an employer, officer, director, owner, employee, partner or other participant, (ii) assist others in engaging in any competitive business in the manner described in the foregoing clause (i), or (iii) induce employees of the Company, its affiliates or subsidiaries to terminate their employment with the Company or such affiliate or subsidiary and/or engage in any competitive business. I understand that this Section 9 is not meant to prevent me from earning a living or fostering my career. It is meant, however, to prevent any competitive business from gaining any unfair advantage from my knowledge of Proprietary Information and I agree to make any new employer aware of the provisions of this Section 9.  A competitive business shall not include a business that designs, constructs or operates trichlorosilane, silane or polysilicon plants, except that this exclusion does not apply to a business that sells or designs and sells reactors, converters or other equipment (with or without services related thereto) competitive with those that GT may be selling at the time of the termination of the Executive's employment from the Company.

10.  **Agreement Not to Solicit Customers** - During the course of my employment by the Company for a period of three (3) years following the termination of such employment for any reason whatsoever and whether such termination be voluntary or involuntary, I will not, directly or indirectly, as owner, officer, director, stockholder, partner, associate, consultant, manager, advisor, representative, employee, agent, creditor or otherwise, attempt to solicit or in any other way disturb or service, hire, or engage any person, firm or corporation that has been an employee or customer of the Company at any time or times within three (3) years prior to the termination date of my employment, whether or not I had direct account responsibility for a contact with such customer account. The foregoing customer restriction shall not pertain to the customer of a business that designs, constructs or operates trichlorosilane, silane or polysilicon plants, except that this exclusion does not apply to a business that sells or designs and sells reactors, converters or other equipment (with or without services related thereto) competitive with those that GT may be selling at the time of the termination of the Executive's employment from the Company.

11.  **Remedies** - I acknowledge that a remedy at law for any breach or threatened breach of the provisions of this Agreement would be inadequate and, therefore, agree that the Company shall be entitled to injunctive relief in addition to any other available rights and remedies in case of any  such breach or threatened breach; provided, however, that nothing contained herein shall be construed as prohibiting the Company from pursuing any other remedies available for any such breach or threatened breach.

Exhibit 1 - 6

12. **Assignment** - This Agreement and the rights and obligations of the parties hereto shall bind and inure to the benefit of any successor or successors of the Company, whether by reorganization, merger, consolidation, sale of assets or otherwise, except that neither this Agreement nor any rights or benefits hereunder may be assigned by me.

13. **Interpretation** - It is the desire and intent of the parties hereto that the provisions of this Agreement shall be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought. Accordingly, if any particular provision of this Agreement shall be adjudicated to be invalid or unenforceable, such provision shall be deemed amended to delete therefrom the portion thus adjudicated to be invalid or unenforceable, such deletion to apply only with respect to the operation of such provision in the particular jurisdiction in which such adjudication is made. In addition, if any one or more of the provisions contained in this Agreement shall, for any reason, be held to be excessively broad as to duration, geographical scope, activity or subject, it shall be construed by limiting and reducing it so as to be enforceable to the extent compatible with the applicable law as it shall then appear.

14. **Notices** - Any notice which a party is required or may desire to give pursuant to this Agreement shall be given by personal delivery or registered or certified mail, return receipt requested, addressed to the Employee at the address of the Employee of record with the Company and addressed to the Company at its principal office, or at such other place as either party may, from time to time, designate in writing. The date of personal delivery or the date of mailing any such entice shall be deemed to be the date of delivery thereof.

15. **Waivers** - If either party shall waive any breach of any provision of this Agreement, her or it shall not thereby be deemed to have waived any preceding or succeeding breach of the same or any other provision of this Agreement.

16. **Headings** - The headings of the sections hereof are inserted for convenience only and shall not be deemed to constitute a part hereof nor to affect the meaning hereof.

17. **Governing Law** - This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New Hampshire with respect to contracts made and
to be performed wholly therein and the courts of which shall have exclusive jurisdiction over
any disputes arising hereunder .

18. **No Employment Agreement** - I acknowledge that this Agreement does not constitute an employment agreement and agree that this Agreement shall be binding upon me regardless of whether or not my employment shall continue for any length of time hereafter and whether or not my employment is terminated for any reason whatsoever by either the Company or me or both.

Exhibit 1 - 7

19. **Complete Agreement; Amendments: Prior Agreements** - The foregoing is the entire agreement of the parties with respect to the subject matter hereof and may not be amended, supplemented, canceled or discharged except by written instrument executed by both parties hereto. This Agreement supersedes any and all prior agreements between the parties hereto with respect to the matters covered hereby.

I HAVE READ AND AGREE TO THE FOREGOING.

Date: _12 APRIL 2006_

Employee

Exhibit 1 - 8