IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| GTAT CORPORATION,<br><br>            Plaintiff,<br><br>vs.<br><br>CHAD FERO,<br><br>            Defendant. | CV 17–55–M–DWM<br><br>ORDER |

On May 3, 2017, Plaintiff GTAT Corporation's ("GTAT") received a temporary order restraining former employee Defendant Chad Fero ("Fero") from accessing, using, disclosing, or making available to any person or entity other than GTAT, any of GTAT's confidential, proprietary, or trade secret documents, data, or information. (Doc. 8.) On May 16, 2017, a hearing was held on whether that temporary restraining order should be turned into a preliminary injunction. (*See* Minute Entry, Doc. 18.) At that hearing, the parties presented testimony and evidence and the temporary restraining order was extended for ten days pending a judicial determination on the issuance of a preliminary injunction.

1

GTAT has not shown, for the purposes of a preliminary order, that Fero likely used its trade secrets and that an injunction is warranted while the case progresses.

## FACTUAL BACKGROUND

GTAT is a technology company that offers equipment and technology in the solar and electronics industries. (Compl., Doc. 1 at ¶ 5.) Part of GTAT's business is devoted to technology and equipment utilized in the polysilicon process, a raw material used primarily in the solar industry. Hearing Tr. 15 (Gum). The polysilicon portion of its business is based out of Missoula, Montana. Hearing Tr. 14 (Gum). The defendant, Fero, began working for GTAT in 2006 as an engineer and eventually as a director of both the technology and development divisions. Hearing Tr. 155 (Fero). In his position, Fero was involved with the research and development of GTAT's polysilicon technology. *Id.*

While general processes for producing polysilicon are generally known, *see* Hearing Tr. 23 (Gum), over the last decade GTAT has engaged in research and development to create its own proprietary polysilicon process. The two primary components of the polysilicon process are hydrochlorination, or turning of metallurgical-grade silicon into gas, and chemical vapor deposition ("CVD"), the purification and redeposition of that gas. Hearing Tr. 16-17 (Gum). GTAT is a

market leader in hydrochlorination technology, and about half of the world's polysilicon is made from trichlorosilane made from GTAT's technology. Hearing Tr. 17 (Gum). In the context of relative capacity, GTAT's technology and equipment has a capacity of approximately 250,000 metric tons of trichlorosilane per year while the closest leading competitor is on the order of 150,000 metric tons. *Id.* Similarly, in relation to CVD, the products marketed and sold by GTAT are capable of approximately 1,000 metric tons of polysilicon production per year and the closest competition is around 600 to 700 metric tons. Hearing Tr. 18 (Gum).

According to Jeffery Gum, Director of Global Sales for GTAT, it took GTAT almost a decade and millions of dollars to develop the knowledge and equipment used in its polysilicon process. Hearing Tr. 19-26 (Gum); Ex. 1. With its knowledge and expertise, GTAT offers its clients complete "basic engineering packages" ("BEPs"), or blueprints, and equipment packages for the establishment of polysilicon plants. Hearing Tr. 27 (Gum); Exs. 2, 3 (sealed). Although GTAT does not manufacture the equipment, it works with fabricators around the world to produce equipment that is provided directly to the client. Hearing Tr. 30 (Gum).

GTAT treats all of the information, materials, and equipment surrounding its polysilicon process as confidential and proprietary, and requires sales material

3

be labeled accordingly. Hearing Tr. 46-47 (Gum). As described by Mr. Gum, the alleged trade secrets at issue here fall into three "buckets," the (1) materials of construction, (2) internal components, and (3) specific processes involved in the polysilicon process. Hearing Tr. 33-34; *see also* Doc. 21 (sealed).

At the time he was hired, Fero signed a Confidentiality Agreement, agreeing to keep confidential technical and business information acquired by GTAT, even after his employment ended. (*See* Doc. 5-2 at 3-8.) Fero was also aware of the GTAT's Code of Conduct, which specifies that employees must protect the confidentiality of GTAT's intellectual property and proprietary information. *See* Hearing Tr. 46 (Gum explaining that Fero would review his sales presentations to ensure they did not contain confidential information).

In September 2016, Fero left his employment with GTAT. Hearing Tr. 159 (Fero). Shortly after his employment ceased, he entered into a consulting agreement with GTAT and worked in that capacity until early January 2017. Hearing Tr. 53 (Gum). No exit interview was performed. Hearing Tr. 160 (Fero). Since leaving GTAT, Fero has been operating a polysilicon technology business under the name "Ferosilicon." *See* Hearing Tr. 170 (Fero). While Fero is not bound by a non-compete provision, GTAT alleges that Fero could not have "independently developed the chemical processes, equipment designs, and

engineering specifications he is now offering without using any of GTAT's trade secret information." (Doc. 1 at ¶ 30.)

GTAT presents various evidence in support of its belief that Fero misappropriated its trade secrets, focusing primarily on a $10 million deal with a Chinese company that had been in development since October 2015 and was expected to close in April 2017. *See* Ex. 4 (sealed). When Mr. Gum arrived to close the deal he was informed by the Chinese company that it could no longer proceed at the $10 million price because Fero had offered "essentially the same technology and equipment at a much lower price." Hearing Tr. 60 (Gum). GTAT was only able to make a sale of a BEP, not an entire technology and equipment package, for approximately $750,000. Hearing Tr. 80-81 (Gum).

## LEGAL STANDARD

A party seeking a preliminary injunction "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [it]s favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). A plaintiff only need raise "serious questions going to the merits" so long as the balance of hardships tips sharply in the plaintiff's favor and the remaining two *Winter* elements are met. *Alliance for the Wild Rockies v.*

5

*Cottrell*, 632 F.3d 1137, 1131 (9th Cir. 2011).

ANALYSIS

GTAT raises the following claims: (1) misappropriation of trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*; (2) misappropriation of trade secrets under the Montana Uniform Trade Secrets Act, Mont. Code Ann. § 30-14-401, *et seq.*; (3) breach of the Confidentiality Agreement; (4) breach of the implied covenant of good faith and fair dealing; (5) intentional interference with business relations; and (6) punitive damages. (Doc. 1.) GTAT's request for a preliminary injunction appears to rest solely on its claims for misappropriation of trade secrets and breach of the Confidentiality Agreement. Regardless, GTAT fails to make the necessary preliminary showing of likelihood of success to justify the issuance of a preliminary injunction.

I. **Likelihood of Success on the Merits**

A. **Trade Secrets Claims**

Under Federal law, "[a]n owner of a trade secret that is misappropriated may bring a civil action" so long as the product or service is used in or is intended to be used in interstate commerce. 18 U.S.C. § 1836(b)(1). Pursuant § 1839(3):

> the term "trade secret" means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs,

prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if--

(A) the owner thereof has taken reasonable measures to keep such information secret; and

(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

*See also* Mont. Code Ann. § 30-14-402(4) (providing a similar definition under Montana law). A person misappropriates such information if, *inter alia*, he or she used improper means to acquire knowledge of the trade secret or, at the time of disclosure, knew or had reason to know of a duty to maintain its secrecy. *See* 18 U.S.C. § 1839(5)(B); § 30-14-402(1), (2)(b)(I). To prevail on its trade secrets claims, GTAT must show that: (1) it took reasonable measures to keep the information secret, (2) the information derives independent economic value from not being generally known or readily ascertainable, and (3) the information was misappropriated by Fero. Such a showing has not been made at this stage.

The primary challenge here is determining where GTAT's confidential information and trade secrets end and where Fero's experience and ability begin. It is undisputed that Fero has nearly two decades of experience in the polysilicon

industry, including over seven years' experience before being hired by GTAT in 2006. Hearing Tr. 152-153 (Fero). He was then intimately involved with the creation of GTAT's polysilicon division. Hearing Tr. 155 (Fero). Separating the man from the secrets at this preliminary stage is therefore no easy task.

It is also undisputed that Fero can compete with GTAT in the polysilicon market and can even solicit GTAT's own clientele. *See* Hearing Tr. 98 (Gum). Fero's original employment contract with GTAT indicates his desire to be able to leave and consult freely in the industry. Ex. 7. And, GTAT was aware he was thinking of leaving the company in 2011, but convinced him to stay. *See* Ex. 8 (sales compensation incentive). Accordingly, GTAT's reliance on his registry of a domain for his company, his formation of that limited liability company, Hearing Tr. 199-200 (Fero), and the purchase of corrosion machinery to pursue independent research and development, Hearing Tr. 219-20 (Fero)—all during his employment with GTAT—does not evidence a threat of misappropriation. Nor can GTAT shoehorn in a non-compete requirement through its misappropriation claim based on the fact that Fero approached an existing client of GTAT. *See* Hearing Tr. 95-96 (recognizing non-compete provision is unenforceable).

Turning to the elements of a "trade secret," GTAT has presented evidence as to the reasonable measures it takes to protect its trade secrets, such as the use of

physical and electronic security, carefully marking sales materials as "confidential," and having employees sign confidentiality agreements. *See* Hearing Tr. 46-47 (Gum). While that evidence is largely undisputed by Fero, testimony revealed that some of the security measures GTAT had in place may not have been regularly enforced, raising the question as to whether having a policy but failing to enforce it is sufficient to meet the "reasonable measures" standard. Such evidence includes the fact Fero did not have an exit interview, Hearing Tr. 160 (Fero), the lack of effort to recover Fero's 2011-2016 Panasonic Toughbook laptop, Hearing Tr. 142 (Carroll), employees using DropBox despite GTAT policy, *see* Hearing Tr. 162-63 (Fero); Hearing Tr. 139 (Carroll), and employees using USB drives despite GTAT policy, Hearing Tr. 139 (Carroll); Hearing Tr. 50 (Gum). Even assuming GTAT made the requisite showing, however, it has not demonstrated a likelihood of success as to the remaining requirements of its claim.

GTAT must show the trade secrets derive independent economic value by not being widely known. GTAT has shown it holds a market advantage, *see* Hearing Tr. 17-18 (Gum), but admits that much of the polysilicon process is generally known, *see* Hearing Tr. 23 (Gum). As was recently articulated in *Waymo LLC v. Uber Technologies, Inc.*, "it would be wrong to allow any company to leverage a single solution into a broad swath of other solutions . . . . To do so

9

would be to allow monopolization of broad scientific and engineering concepts and principles." 2017 WL 2123560, at *7 (N.D. Cal. May 15, 2017).

As mentioned above, GTAT identified trade secrets that fall into three general "buckets": (1) materials of construction, (2) internal components, and (3) specific processes involved in the polysilicon process. Hearing Tr. 33-34 (Gum). Since the May 16 hearing, GTAT has provided the Court with a sealed document specifically identifying that information that it believes to be trade secrets. Fero reviewed that filing and submitted a response. Those filings indicate many of the trade secrets GTAT identifies may either be known by others in the field, disclosed in patent applications, or previously disclosed by GTAT itself. Of the over 60 items identified, Fero agrees that only 8 may in fact be trade secrets. Like Waymo, it appears GTAT attempts to cut too broadly a swath. Assuming without deciding that more than the 8 items identified by Fero qualify as trade secrets, GTAT has failed to make a preliminary showing as to misappropriation.

At the time the temporary restraining order was issued, the information Fero was alleged to have taken on two USB drives established a threat of misappropriation. That evidence is no longer persuasive given that one of the USB drives was in GTAT's possession and the directory for the other shows no sign of GTAT confidential information. *See Giftango, LLC v. Rosenberg*, 925 F.

Supp. 2d 1128, 1139 (D. Or. 2013) (noting change in facts known from temporary restraining order to preliminary injunction).

During the hearing GTAT presented a few additional theories to support its belief that Fero has, or had the ability, to take GTAT information with him when he left. First, Fero allegedly never returned his 2011-2016 work laptop, a Panasonic Toughbook, that could contain confidential and proprietary information. Hearing Tr. 51 (Gum); 131, 141 (Carroll). Second, Fero established a DropBox account in 2013 affiliated with his work email account. Hearing Tr. 133 (Carroll); Ex. 10. That DropBox account was then deleted in October 2016, after Fero left GTAT. Hearing Tr. 136 (Carroll); Ex. 11. According to Gabe Carroll, Manager of Corporate IT Services at GTAT, GTAT implemented a no-DropBox policy in 2013. Hearing Tr. 145-46.

Fero testified that he had believed he had returned the Toughbook to GTAT. Hearing Tr. 161 (Fero). He also testified that was not aware he was not allowed to have a DropBox account and that his use was personal. Hearing Tr. 162-63. Although GTAT provides grounds for speculation and suspicion as to what Fero could have uploaded onto DropBox or taken on the Panasonic laptop, it is not able, at least at this time, to show any information was actually taken by either means. *Compare with Waymo*, 2017 WL 2123560 (containing record evidence

that engineer absconded with over 14,000 files). Given that GTAT never did an exit interview, Hearing Tr. 160 (Fero), never requested return of the Panasonic laptop, Hearing Tr. 142 (Carroll), and there are disputes as to the enforcement and knowledge regarding GTAT's no-DropBox policy, *see* Hearing Tr. 162-63 (Fero), such evidence is insufficient to establish a sufficient threat of misappropriation.

Finally, GTAT presented evidence as to Fero's business offerings themselves, specifically as demonstrated in Fero's April 2017 dealings with a Chinese company. *See, e.g.*, Hearing Tr. 54-68 (Gum). GTAT insists the offer shows misappropriation because Fero proposed essentially the same technology as GTAT, the stage of FeroSilicone's development is not sufficient to support the proposal Fero gave, and the lack of expertise of Fero's alleged partners. GTAT insists that the comprehensive BEP presented by Fero to the Chinese company contained detailed chemical, technical, and engineering information which Fero could not have developed on his own in a matter of months without using GTAT's proprietary technology. *See* Hearing Tr. 68, 70, 72 (Gum); Exs. 6, 12, 16.

In response, Fero testified that he had invested over $70,000 in his company, *see* Ex. 16, set up his own corrosion lab, Hearing Tr. 170, relied extensively on publicly-available articles, *see* Exs. 13, 14, 15, was planning to partner with a leading expert in the polysilicon field, Hearing Tr. 193-94, and was

12

not offering the same type of comprehensive BEP as that offered by GTAT, Hearing Tr. 165. While further discovery may show that Fero's business was not proceeding with organic information, the existing record does not persuasively show otherwise. Through Fero's testimony, the expert declaration submitted by his partner Keith Adams, and his response to GTAT's identified trade secrets, Fero presents plausible explanations for both his knowledge and the BEP offered. While the table of contents for Fero's BEP is facially similar to that of GTAT, it omits portions of GTAT's offering. *See* Hearing Tr. 165-66 (Fero). It also reflects the BEP previously used and offered by Mr. Adams. (*See* Doc. 27-1 at ¶¶ 14-17.)

It may be that with further discovery GTAT can make the requisite showing of misappropriation to warrant a permanent injunction down the road. GTAT has not made the requisite preliminary showing of likelihood of success on this claim.

### B. Breach of Contract

Similarly, GTAT fails to make a preliminary showing of likelihood of success on its breach of contract claim. As part of the Confidentiality Agreement, Fero agreed, *inter alia*, to (1) keep confidential any technical or business information he learned while employed at GTAT, and (2) to return all materials relating to GTAT's confidential information upon leaving. *See* Ex. 7. GTAT fails to present persuasive evidence showing Fero violated either duty at this stage.

13

## C. Implied Covenant

"Every contract contains a covenant of good faith and fair dealing. A breach of the implied covenant constitutes a breach of the contract." *Hardy v. Vision Serv. Plan*, 120 P.3d 402, 405 (Mont. 2005) (internal citation omitted). The implied covenant of good faith and fair dealing requires honesty in fact and observance of reasonable commercial standards of fair dealing in the trade. Mont. Code Ann. § 28-1-211. The nature and extent of the obligations of good faith and fair dealing are measured by the parties' justifiable expectations. *Hardy*, 120 P.3d at 405. "Expectations that contradict an express term of the contract are *per se* unjustifiable." *Forsman v. United Fin. Cas. Co.*, 966 F. Supp. 2d 1091, 1105 (D. Mont. 2013). Although GTAT has presented evidence that Fero attempted to solicit a Chinese client, Fero was not precluded from competing. GTAT has therefore not made the requisite showing of likelihood of success on this claim.

## D. Interference with Business Relations

A claim for intentional interference with business relations or intentional interference with prospective economic advantage requires a showing of acts that: "(1) are intentional and willful; (2) are calculated to cause damage to the plaintiff's business; (3) are done with the unlawful purpose of causing damage or loss, without right or justifiable cause on the part of the actor; and (4) result in

14

actual damages or loss." *Maloney v. Home & Invest. Ctr., Inc.*, 994 P.2d 1124, 1132 (Mont. 2000). Once again, the only relevant evidence GTAT presents is the Chinese deal discussed above. It is undisputed that Fero was not bound by a non-compete provision and could solicit any customers he wanted, including the Chinese company. GTAT has not made the requisite showing as to this claim.

### E. Punitive Damages

GTAT has presented no evidence of actual malice as required by Montana Code Annotated § 27-1-221. GTAT has not made the requisite showing of likelihood of success on this claim.

## II. Irreparable Harm

Even if GTAT as to able to show a likelihood of success, it has not shown irreparable harm such that warrants injunctive relief. Although a plaintiff is not required to show actual harm at the preliminary injunction stage, a plaintiff "must establish that irreparable harm is *likely*, not just possible." *Alliance for the Wild Rockies*, 632 F.3d at 1131. The likely harm must be supported by a "clear showing," *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam), and speculative injury is insufficient, *Goldies Bookstore, Inc. v. Superior Court*, 739 F. 2d 466, 472 (9th Cir. 1984).

Although the diminution in the value of trade secrets and confidential

information cannot generally be addressed through the payment of damages, *see Wellness Coaches USA, LLC v. MGM Resorts Int'l*, 2015 WL5146701, at *6 (D. Nev. Sept. 1, 2015), the degree and imminency of the harm alleged here is circumspect. GTAT points to a single deal with a Chinese supplier as evidence of the harm it faces in the absence of an injunction. However, that alleged damage has already occurred and there is a clear monetary measure of loss for that deal. *See* Ex. 4 (sealed). Other than to speculate as to Fero's continued activity, it is unclear what remaining harm GTAT faces in the status quo, or that such harm could not be remedied by monetary damages. Moreover, it is undisputed that even absent an injunction Fero is precluded from using GTAT's trade secrets in his business. GTAT fails to show that harm is not only possible, by likely. *Alliance for the Wild Rockies*, 632 F.3d at 1131.

### III. Balance of Equities and the Public Interest

The balance of the equities and consideration of the overall public interest in this case weighs against granting preliminary relief as requested by GTAT. GTAT's interest in preventing disclosure of its trade secrets must be weighed against both Fero and the public's interest in competition and development in the industry. As discussed above, Fero is precluded in the status quo from using and disclosing GTAT's trade secrets. A fact Fero concedes and understands. Hearing

Tr. 215 (Fero). Although the parties' filings show they disagree as to what qualifies as a trade secret, GTAT presents no evidence that Fero has possession of any of its confidential documents or disclosed its trade secrets to others.[1] At this stage, enjoining Fero's use of the all of the information identified by GTAT would be disproportionate to GTAT's limited showing of misappropriation by Fero. That said, if a jury finds that GTAT's trade secrets have been wrongly incorporated into Fero's BEPs or further offerings, Fero may not be protected from a permanent injunction stripping those trade secrets from the offending technology and equipment. *See Waymo*, 2017 WL 2123560, at n.8.

## CONCLUSION

Although GTAT may be able to prove its claims based on further discovery and evidence, it has not done so on the present record as to warrant preliminary injunctive relief. Based on the issues discussed above, the case warrants an expedited schedule to both timely and thoroughly address the parties' concerns. At the pretrial conference set for June 29, 2017, the parties should be prepared to discuss, and make their respective proposed pre-trial deadlines address, a trial

---

[1] This is not to say that the Court is convinced by all of Fero's challenges to those items identified by GTAT as trade secrets. For example, Fero cites a passage to indicate that certain temperature information is in a published article but the passage included does not reference temperature. Fero is advised to tread cautiously in his use or disclosure of those items identified by GTAT.

17

timeline of approximately 90-120 days. (*See* Doc. 26.)

IT IS ORDERED that GTAT's request for a preliminary injunction is DENIED. The temporary restraining order originally entered May 3, 2017, and extended May 16, 2017, is LIFTED.

Dated this 25th day of May, 2017.

10:36 AM

Donald W. Molloy, District Judge
United States District Court